UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA JACKSON, as Administratrix of the ESTATE OF LEONARD J. GIGUERE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 08-40024-FDS |

**ORDER ON PLAINTIFF'S MOTION FOR NEW TRIAL**

**SAYLOR, J.**

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. It is, in substance, an action for wrongful death resulting from medical malpractice. Plaintiff Cynthia Jackson is the administratrix of the estate of Leonard Giguere, her father. She alleges that negligent post-operative medical care provided at the United States Department of Veterans Affairs facility in West Roxbury, Massachusetts, caused Mr. Giguere's death.

The case was tried to the Court without a jury in April 2010. On March 25, 2011, the Court issued its findings of facts and conclusions of law. In substance, it concluded that the actions taken by the VA physicians were within the range of the accepted medical practice, and did not fall below the standard of care; it therefore found for the United States.

Plaintiff has now moved for a new trial, raising various alleged errors of law and fact. For the reasons set forth below, the motion will be denied.

**I.    Background**

Leonard Giguere was a 58-year-old resident of Worcester, Massachusetts, and a Vietnam

veteran. He came to the West Roxbury VA on May 4, 2005, complaining of chest tightness. At the hospital, physicians concluded that he had suffered a myocardial infarction—in common language, a heart attack. They also discovered that Mr. Giguere had a highly unusual anatomy: due to a past trauma, his diaphragm had herniated, and his stomach and part of his colon had migrated into his chest cavity. As a result, his esophagus had a u-turn in it, rather than a straight passage down to his stomach.

His cardiothoracic surgeon, Dr. Michael Crittenden, concluded that Mr. Giguere required coronary bypass surgery. That surgery took place on May 6. It proceeded normally, and Mr. Giguere was sent to the surgical intensive care unit to recover.

A common result of major surgery is an ileus: a blockage of the gastrointestinal tract so that food, liquids, or gas cannot pass. Mr. Giguere developed an ileus at some point after the surgery. Because gas and other material from his upper digestive tract could not pass through his system, his stomach became distended. For persons with a normal anatomy, a distended stomach normally produces a swollen and tender abdomen. When Mr. Giguere's stomach distended, however, it pressed against his left lung and heart, causing pulmonary and cardiac stress.

A nasogastric ("NG") tube inserted through the esophagus into the stomach would have provided a possible means of suctioning gas or fluid and relieving the pressure, although it would not have resolved the ileus. Dr. Crittenden attempted after the surgery to insert an NG tube, but was not successful in inserting the tube past the u-turn in the esophagus. Because an ileus normally resolves on its own, and because continued efforts to insert the tube posed a risk of perforation of the esophagus, Dr. Crittenden adopted what was in essence a wait-and-see approach, and did not make further efforts to insert a tube over the next two or three days.

The ileus, however, did not resolve, and Mr. Giguere's condition worsened. After a consultation, Dr. Elihu Schimmel, a gastroenterologist, recommended fluoroscopic insertion of an NG tube (that is, with the assistance of x-ray imaging). On May 10, Dr. Stephen Gerzof, a radiologist, attempted to perform the procedure. During the procedure, Mr. Giguere vomited; he aspirated the vomited material; and in the process he suffered another, and fatal, heart attack.

Plaintiff contended that Mr. Giguere died as a result of medical malpractice. Both sides presented well-qualified experts on the issue. Both medical experts gave credible testimony in most respects. The essential disagreement was whether the physicians should have been more proactive in order to deal with the ileus before it worsened.

Dr. Andrew Warner, plaintiff's expert, is the Chairman of the Department of Gastroenterology at the Lahey Clinic and an Associate Professor of Medicine at Tufts School of Medicine and an instructor at Harvard Medical School. Dr. Warner testified that Dr. Crittenden should have consulted with a gastroenterologist earlier in the post-operative period, and that the physicians should have attempted the insertion of an NG tube, by endoscopic means if necessary, at the first indication of a possible ileus. He also testified that as soon as symptoms of an ileus developed, Mr. Giguere should not have been given food or water and should have been taken off narcotic painkillers. He concluded that Mr. Giguere died because his untreated ileus caused his stomach to distend, compressing his heart and lungs, and that the resulting stress, coupled with the May 10 attempt to insert the tube, led directly to his fatal heart attack.

Dr. James Richter, defendant's expert, is a gastroenterologist at Massachusetts General Hospital, where he is the Director of Gastroenterology Quality Management, and an Associate Professor of Medicine at Harvard Medical School. Dr. Richter testified that a post-operative ileus

almost always resolves in a few days, and that because of Mr. Giguere's fragile state, further attempts to insert a tube were to be avoided if possible. He testified that the normal course of treatment was to give the patient a little bit to eat if he could tolerate it, and try to get him out of bed and moving around to try to resolve the ileus. He further testified that when the ileus did not resolve, the options (including intubation) were difficult and dangerous given Mr. Giguere's anatomy and medical condition. He concluded that the course of action taken by the physicians was appropriate under the circumstances, and in accordance with the relevant standard of care.

The Court concluded, in substance, that the approach adopted by the VA physicians did not breach the standard of care, and that the approach taken by the physicians was within the range of accepted medical practice. It therefore found for the United States.

Plaintiff has moved for a new trial on essentially four grounds: (1) that the Court applied an erroneous legal standard as to the standard of care; (2) that the Court erroneously concluded that Mr. Giguere did not ingest solid food on the evening of May 8; (3) that the Court made erroneous conclusions as to the possible advancement of an NG tube prior to May 10; and (4) that the delay between the conclusion of the trial and the issuance of the Court's opinion requires a new trial. The Court will address each argument in turn.

## II.   Analysis

### A.   Timeliness of Motion

As a threshold matter, the government notes that plaintiff's motion for a new trial was untimely under the Local Rules, and seeks denial on that basis. "A motion for a new trial must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). All electronic transmissions "must be completed prior to 6:00 p.m. to be considered timely filed that day." D.

Mass. Local Rule 5.4(D). Plaintiff filed the motion at 6:44 p.m. on the twenty-eighth day, and therefore her motion was technically untimely.[1]

"To deviate from a local rule, the district court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantial rights are unfairly jeopardized." *Puerto Rico American Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 132 (1st Cir. 2010), *accord*, *Garcia-Goyco v. Law Envtl. Consultants, Inc.*, 428 F.3d 14, 19-20 (1st Cir. 2005). "It is within the district court's discretion to dismiss an action based on a party's unexcused failure to respond to a dispositive motion when such a response is required by a local rule." *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 116 (1st Cir. 2004) (quoting *NEPSK, Inc. v. Town of Houlton*, 283 F.3d 7 (1st Cir. 2002).

Here, it is difficult to see any meaningful prejudice that resulted from the 44-minute delay. While there may be circumstances where even a short delay could cause some degree of prejudice, no such circumstance exists here. The Court will accordingly overlook the violation.

### B.     The Standard for a New Trial

Under Fed. R. Civ. P. 59, a motion for a new trial in a nonjury case "should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Ball v. Interoceanica Corp.*, 71 F.3d 73, 76 (2d Cir. 1995), citing 11 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2804 (2d ed. 1995).

---

[1] Local rules have the force of law. *Hollingsworth v. Perry*, 130 S. Ct. 705, 710 (2010) (citing *Weil v. Neary*, 278 U.S. 160, 169 (1929) (local rules have the force of law); *Fraser and Wise, P.C. v. Primary Primates, Inc.*, 966 F. Supp. 63, 70 (D. Mass. 1996) (quoting *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994) ("Valid local rules 'carry the force of law.'"); *In re Jarvis*, 53 F.3d 416 (1st Cir. 1995) ("[o]nce local rules have been properly promulgated, lawyers and litigants are duty bound to comply with them."); *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994); *accord*, *Blanchard v. Cortes-Molina*, 453 F.3d 40, 46 (1st Cir. 2006).

### C.        **Whether the Court Applied the Proper Standard of Care**

Plaintiff first contends that the Court committed a "manifest error of law" by holding "that the applicable legal standard of care . . . was the standard treatment given to all postoperative patients in whom an ileus emerges." (Pl. Mem. at 3). Plaintiff argues that because Mr. Giguere had an unusual anatomy, "the standard medical treatment or protocols are not the relevant legal standard of care, but rather each patient deserves treatment medically suited to [his or her] own individual needs." (Pl. Mem. at 8).

Plaintiff miscasts this argument as an error of law. The legal standard applied by the Court in this case was the Massachusetts standard for medical malpractice; that is, "whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession." (Op. at 31, citing *Brune v. Belinkoff*, 354 Mass. 102, 109 (1968)). The Court also noted that "a specialist should be held to the standard of care and skill of the average member of the profession practicing the speciality, taking into account the advances in the profession." (*Id.*). The standard of care "does not require the best care possible," and the skill level required is "not the middle but the minimum common skill" (*Id.*, citing *Palandjian v. Foster*, 446 Mass. 100, 105 (2006), and W.C. PROSSER & W.P. KEETON, TORTS § 32 at 187 (5th ed. 1984)). Plaintiff does not dispute that this was the correct legal standard.

What the standard of care required in a particular case, and whether that standard of care was breached, are questions of fact, normally requiring expert testimony to resolve. *See Heinrich v. Sweet*, 308 F.3d 48, 63 (1st Cir. 2002). The standard of care is "not static or rigid," but depends upon a multitude of factors. *Id.*

The Court carefully considered the testimony of two highly-qualified experts in gastroenterology as to what care was appropriate under the circumstances. That inquiry focused in part on Mr. Giguere's unusual[2] anatomy, but that was not the only relevant factor. Among other things, the inquiry took into account his age, his medical condition, and his disease process. In particular, that inquiry considered the fact that Mr. Giguere was at great risk even before the surgery was performed, and was in a highly fragile state afterward.

Plaintiff contended that the standard of care under the circumstances required a more aggressive approach; the government contended that the more conservative approach that was taken was appropriate. The Court concluded that the approach taken did not breach the standard of care. In making that conclusion, the Court did not conclude that a one-size-fits-all, cookie-cutter approach to patient care was required, as plaintiff seems to suggest. Rather, the Court concluded that under the circumstances presented—including all of the unusual factors presented by the patient—the care provided did not fall below the relevant standard. Plaintiff has not provided any newly-discovered evidence as to this issue, and in effect simply re-argues the issues that were raised at trial. The Court has considered the issue with some care, and declines to order a new trial on that basis.

Accordingly, to the extent that plaintiff contends that the Court made an error of law as to the relevant legal standard, that objection is without foundation. To the extent plaintiff contends

---

[2] Plaintiff objects to the Court's use of the word "unique," rather than "unusual" or "atypical," to describe Mr. Giguere's anatomy. (Pl. Reply Mem. at 1-2 n. 2). It is true that, strictly speaking, the word "unique" means "one of a kind," not simply unusual. Because there is no evidence that Mr. Giguere's anatomy was actually "unique," in the sense that he was the only person in the world with such a condition, the Court's use of the adjective was not precisely correct. The Court will amend its findings to substitute the word "unusual" for "unique." No material change to the findings is intended.

that the Court made one or more erroneous factual findings, the Court declines to revisit the issue, and the motion for a new trial will be denied.

>    **D.    Whether the Court Erroneously Concluded That Mr. Giguere Did Not Ingest Solid Food**

Plaintiff contends that it was "clearly proved" that Mr. Giguere ingested solid food on the evening of May 8, and that the Court's finding to the contrary was erroneous. She further contends that this error was highly material, as the ingestion of solid food was one of the underpinnings of Dr. Warner's testimony that the VA physicians committed malpractice.

Plaintiff again essentially reargues the point that she made at trial, using the same evidence. It is true that the evidence as to that issue was in some conflict, and contained a number of ambiguities. For example, Kathleen Doherty, a registered nurse who was on the staff at the facility, testified at trial that Mr. Giguere was given only liquids on May 8. (*See, e.g.,* Tr. III: 180-82, 185-86). Counsel for plaintiff sought to impeach her with her deposition testimony, which appeared to be somewhat contradictory as to that issue. (Tr. III: 187-90). Based on the evidence as a whole—including the medical records as interpreted in light of the trial testimony, and the Court's observations of Nurse Doherty's testimony as a witness—the Court concluded that Mr. Giguere did not ingest solid food on May 8.[3] That conclusion is not, of course, free from doubt, but in a civil case factual findings do not require such exacting proof.

Plaintiff further contends that the government's attorney "virtually conceded in his closing that Leonard Giguere may have been given solid food during his postoperative course." (Pl.

---

[3] Plaintiff also cites to the deposition of Lyuba Ryzhenkova, another nurse at the VA facility, contending that she testified that Leonard Giguere "was" eating solid food. (Pl. Mem. at 10). In fact, the deposition testimony cited by plaintiff indicates that Mr. Giguere "could" eat solid food according to the orders given; she did not testify that he actually did so. (Tr. V: 76-77).

8

Mem. at 10). The government's entire argument as to that issue was as follows:

> Now, there has been some discussion of what occurred on day -- postoperative day three and whether Mr. Giguere was given any food, and I would note from Ms. Doherty's testimony, and it has been pointed out throughout the record, and you'll see it in, I believe, in Dr. Pericles' testimony that every one of the orders, whether he was given food or not, every one of the orders says ADAT, and what that stands for is advance diet as tolerated.
>
> So, it appears mostly from the record that Mr. Giguere was on a -- on a liquid diet or a full liquid diet up until the 10th, but whether it was liquid or a cardiac diet, it was only to be advanced as tolerated.
>
> So Mr. Giguere would only have taken in that which he could tolerate, and that's another point in terms of why he received the proper care while he was in the hands of the V.A. postoperatively is that there was care for the patient even with respect to what he was taking in. If he couldn't tolerate it, it wasn't going to be given to him.
>
> And, in fact, on that morning of the 9th, he said, "I can't take it. I can't eat anything. I feel bloated." He was taken off of anything orally. It was ordered for him to be NPO, nothing by mouth, and he was given nothing by mouth. His wishes were respected, and his condition was respected, and he was managed very, very carefully.

(Tr. V: 100-01). Thus, the government argued that it "appears mostly from the record" that Mr. Giguere was on a full liquid diet. It also argued that even if he was given something more than liquids, he was only given what he could tolerate, and that it was appropriate under the circumstances to do so. That is hardly a "concession" that he was fed solid food.

Finally, plaintiff argues that the government's failure to call Nurse O'Sullivan, who made certain entries in the medical records, required the inference that her testimony would have been unfavorable. (Pl. Mem. at 11). It is true that a party may be entitled under some circumstances to a "missing witness" jury instruction—that is, where a party has knowledge of a non-hostile witness who could be expected to give material testimony, and fails to call that witness without

9

explanation, the jury *may*, if it chooses, draw the inference that the witness would have given testimony unfavorable to that party. *See, e.g., Commonwealth v. Figueroa*, 413 Mass. 193, 199 (1992). Plaintiff appears to argue that such an inference *must* be made when such a witness is not called. That is incorrect; while such an inference is permissible, it is not mandatory. In any event, the Court declined to draw such an inference in its findings of fact, and sees no reason on the evidence to reconsider that issue.

The Court was not required, of course, to interpret the conflicting evidence in the light most favorable to the plaintiff. Rather, it was required to choose between potentially conflicting views of the evidence based on its weight and credibility. That is exactly what the Court did. Furthermore, the Court was not required to explain every one of its findings in minute detail. The Court carefully considered the point in making its original findings, and has carefully reconsidered it in response to plaintiff's motion for a new trial. It sees no reason to reverse its initial findings.

### E.  Whether the Court's Conclusion as to Possible Advancement of an NG Tube Was Erroneous

The Court concluded that the failure of the VA physicians to insert an NG tube prior to May 10 was not medical malpractice. Plaintiff argues at some length that that conclusion was clearly erroneous or otherwise requires a new trial.

#### 1.  The Testimony of Dr. Gerzof

Plaintiff contends that "none of Leonard Giguere's treating physicians was qualified to testify" in support of the government's position that "placement of an NG tube in this patient was not only contra-indicated, but probably impossible." (Pl. Mem. at 12).[4] In particular, plaintiff

---

[4] The Court notes that the issue is not whether it was "impossible" to place an NG tube, but whether the risk of attempting to do so (including the possibility of perforation) outweighed the likely benefit. For example,

contends that Dr. Gerzof was not qualified to testify on endoscopic procedures and was not identified as an expert by the government "even though he was a non-employee." (Pl. Mem. at 12).

Plaintiff seems to suggest that a treating physician who is not an employee of the defendant cannot give any opinion testimony without a full expert report under Rule 26. That is simply not the law. A treating physician may, as a general rule, give opinion testimony about his or her treatment of a patient—including such matters as the cause of the medical condition, the diagnosis, the alternatives for treatment, the prognosis, and the extent of disability—without preparing an expert report under Rule 26(a). *See, e.g., Downey v. Bob's Discount Furniture Holdings*, 633 F.3d 1, 6 (1st Cir 2011); *Gomez v. Rodriguez*, 344 F.3d 103, 113 (1st Cir 2003); *Garcia v. Springfield Police Department*, 230 F.R.D. 247 (D. Mass. 2005). Here, Dr. Gerzof testified in accordance with the general rule. His employment status is irrelevant; he was a treating physician, not an expert who was engaged specifically for purposes of the trial.

Plaintiff further contends that the Court erroneously found at paragraph 110 that Dr. Gerzof concluded, based on his review of the CT scans, that insertion of an NG tube "could not have been done." The Court agrees that the finding somewhat misstates Dr. Gerzof's testimony, because he based the cited conclusion in part on the autopsy results, not just the CT scans.

A review of Dr. Gerzof's relevant testimony is in order. Dr. Gerzof testified that he attempted to place an NG tube fluoroscopically, without success. (Tr. II: 52-58). He then decided to try inserting a tube using a guidewire with a J-shaped tip. (Tr. II: 58-59). He testified

---

and as noted below, Dr. Schimmel, a gastroenterologist, made a note in the medical records on May 9 that stated, "Given acute angle of stomach with eventration NG tube will likely not be easily placed and there is a risk of perforation . . . ." (Ex. 3 at 84).

11

that the J-tip wire "might be able to find its way around the sharp curve of the cardioesophageal junction, whereas the nasogastric tube, being much stiffer, would not." (Tr. II: 63).

Dr. Gerzof's decision to try the J-tip wire was based on his review of the CT scans. (Tr. II: 82). He testified as follows:

> Q. Why did you try to insert that J wire rather than just continuing with the NG tube?
>
> A. Well, having immediately reviewed the films, knowing that this is the point at which the obstruction caused -- obstruction to the tube caused by the severe kinking of the stomach because of the hiatus hernia, I felt that I could push and push that tube. It would never go anywhere. Ultimately, it might perforate, particularly since I had necrotic -- I was assuming that I had necrotic mucosa. I was hoping to get the softer, flexible tube to go where the nasogastric tube which was much stiffer would simply not curve.

(*Id.*).

> He went on to testify:
>
> Based on my merging the CT scans, which I had reviewed immediately before that, with the plain films, I knew I was just above where that J turn was. So a lot of what I'm saying here is based on not the autopsy findings, as I know them, but the CT scan as I knew it just before I went in. I had a very clear idea of where I was going in and how I wanted to get there.

(Tr. II: 85). He added that food could "barely get through [the esophagus] under normal circumstances." (Tr. II: 86).

Dr. Gerzof was also present at the autopsy. He testified that his medical impression did not change as a result of the autopsy. (*Id.*). He also testified, however, that he did not "appreciate" prior to the autopsy how Mr. Giguere had developed "an encapsulated capsule" of fibrous tissue surrounding his stomach and esophagus. (Tr. II: 87). He also testified that, after he saw the autopsy, he did not think "anybody could have" negotiated an NG tube past the u-turn in

12

the esophagus. (Tr. II: 86). He then added: "It could not have been done." (Tr. II: 87).

Plaintiff objects to the Court's finding in paragraph 110, which states as follows:

> After reviewing the CT scans of Mr. Giguere's stomach and colon, Dr. Gerzof testified that inserting an NG tube "could not have been done" given the unusual anatomy of Mr. Giguere's intestinal tract. (Tr. II: 87).

Again, the Court agrees that the finding does not quite accurately capture Dr. Gerzof's testimony. The Court will revise paragraph 110 accordingly, and substitute the following:

> After reviewing the CT scans of Mr. Giguere's stomach and colon, Dr. Gerzof believed that he could "push and push" an NG tube, but that "[i]t would never go anywhere," given the unusual anatomy of Mr. Giguere's intestinal tract. (Tr. II: 82).

### 2. **Testimony of Dr. Schimmel**

Plaintiff next objects to the Court's findings in paragraph 165 that Dr. Crittenden did not violate the standard of care by failing to consult with a gastroenterologist at an earlier date. Plaintiff particularly objects to the Court's interpretation of the medical note made by Dr. Schimmel, the gastroenterologist, on May 9. That note reads as follows:

> Agree with supportive care as you are doing: minimizing narcotics, [out of bed] as tolerated, frequent turning in bed, aggressive electrolyte repletion. At this point would not place NG tube. Given acute angle of stomach with eventration NG tube will likely not be easily placed and there is a risk of perforation into mediastinum. If patient's condition worsens, would likely need radiographic study (barium swallow) to assess anatomy before NG placement. If absolutely necessary, would favor doboff tube as opposed to ng for decompression (less chance of perforation)[.] Radiology could potentially place NG over guidewire under [fluoroscopy] if needed. Endoscopic [placement] would result in additional air in the upper gi tract, would not be the method of choice for placement.

(Ex. 3 at 84).

The Court concluded as follows:

> . . . there is no evidence that Dr. Schimmel, the gastroenterologist, would have

13

      done anything differently had he been consulted before May 9.  When Dr.
      Schimmel was consulted, he noted that he agreed with the "supportive care you
      are doing" and made no significant changes to the course of treatment, suggesting
      that he approved of the actions taken to that point.

(¶ 165).

      Plaintiff contends that the "only possible inference . . . from the entries [Dr. Schimmel] made in Leonard Giguere's medical chart was that placement of [an] NG tube, either endoscopically or fluoroscopically, was advisable at some point previous to his examination of Leonard Giguere on May 9." (Pl. Mem. at 13).  But that is not the only *possible* inference, much less the only *reasonable* inference.  To the contrary, the note taken as a whole does not suggest any disagreement by Dr. Schimmel with the course of treatment to that point.  Indeed, the "acute angle of stomach with eventration" that made insertion of an NG tube difficult and potentially hazardous was present at all times; it did not become worse over time.  And plaintiff concedes that "[t]here was nothing in Dr. Schimmel's testimony regarding what he might have advised if consulted earlier [than] the afternoon of May 9." (Pl. Mem. at 13 n.8).  The Court's interpretation of the evidence was therefore not only reasonable, it is in accordance with the weight of the evidence.

      Plaintiff also argues that because Dr. Schimmel did not normally work on weekends, a different gastroenterologist would have responded to a request for consultation on May 7 or May 8. (Pl. Mem. at 13 n.8).  Plaintiff then argues that "[a]nother GI physician, presumably younger and less old fashioned in his or her approach to medicine, would have seen the patient over the weekend, and if so on May 8 would have more probably than not recommended a less conservative approach . . . ." (*Id.*).  The Court declines to make such a factual finding,

14

particularly since it appears to be premised almost entirely on an age-based stereotype rather than medical evidence.

### 3. The Expert Testimony of Dr. Richter

Plaintiff contends that certain testimony of Dr. Richter should not have been permitted, as it was outside the scope of his expert report. (Pl. Mem. at 14-17). Plaintiff characterizes the testimony as "opinion testimony to the effect that not only was endoscopic placement of an NG tube likely impossible at any point during Leonard Giguere's post-operative course, but that it was also contraindicated in light of this patient's condition and anatomy." (Pl. Mem. at 14-15). In fact, the testimony was more limited; the relevant testimony was as follows:

> A. [Dr. Richter] . . . Ileus to this degree does not occur commonly or overly frequently after a cardiac surgery. It occurs after any kind of general anesthesia and after any kind of surgery, but it's -- it's not the kind of thing that we anticipate and, therefore, the standard of practice would be not to anticipate or to do anything potentially dangerous because of the specter of what unfortunately eventually occurred.
>
> In addition, when it finally did arise, the options were not particularly good. Placing NG tubes in these people are difficult, dangerous, and -- and not simple procedures, you know, by -- you know, they tried to place it once with or twice just manually by nose, which is the standard approach.
>
> Endoscopically, you know, I have naively attempted to place a number of these, usually unsuccessfully.
>
> . . .
>
> Q. Dr. Richter, you've explained your concurrence with the . . . prudent recommendation that Dr. Schimmel made, and you have mentioned that . . . the risks were too high of proceeding with some type of procedure prematurely.
>
> Could you expand a little bit on what those risks were for the Court.
>
> A. At the -- at a higher level, there was -- you know, at this time, the caregivers had commented that they felt that he was what we call an ASA, or American

15

>Anesthesia Association physical class IV, which is defined as somebody with a severe systemic disease that is a constant threat to -- to life.
>
>So he enters this process, you know, with an underlying constant threat to his life. There is a reasonable likelihood, if not a more than 50/50 through the weekend of his care[,] that with simply more time, his ileus would resolve, and he would get better on his own; and so that's kind of the higherer [*sic*] level.
>
>Then when one considers the potential interventions that one might choose to use, an endoscopy, for example, getting around that particular bend raises a significant amount of risk to bleeding, to perforation, you know, of the digestive tract.
>
>Also putting tubes down his throat requires that you anesthetize him both topically so his gag reflex is decreased. You give him intravenous medication, which can be a stress for sedation, which can be a stress to his heart; and in addition, particularly with endoscopy, when you have to get down there with a scope that takes up space and infuse air that then further compromises his ability to expand his lungs and so the notion that one is doing endoscopy on this person, who has a reasonable chance of spontaneous improvement is deeply troubled [*sic*].
>
>Q. And would this also apply to the NG insertion also?
>
>A. Yeah. Most of those complications, except for the notion of -- the NG tube choice is slightly better because there is no insufflation of the esophagus, and, therefore, less compromise to his pulmonary function, and it is often done with less intravenous sedation.

(Tr. IV: 22-27). Thus, Dr. Richter testified in substance that all of the options, of which endoscopic placement was one, carried significant risks under the circumstances.

Plaintiff objected at the trial that Dr. Richter's expert report did not discuss the possible endoscopic placement of an NG tube. In response to that objection, and because the testimony did not extend significantly beyond his written opinion, the Court indicated that it would permit the testimony, and provide plaintiff with additional time as necessary to respond or to provide rebuttal testimony. (Tr. IV: 25). In the end, plaintiff submitted an affidavit from Dr. Warner in direct response to the disputed testimony. (Docket No. 65).

Plaintiff objects to the testimony as constituting unfair surprise. Plaintiff further contends that the Court in its findings of fact "completely failed to account for, or even mention," Dr. Warner's affidavit, even though it "completely and effectively refutes Dr. Richter's more tentative testimony." (Pl. Mem. at 15). Plaintiff goes so far as to argue that the Court "may have failed to consider [the affidavit] at all." (Pl. Mem. at 16).

There was no unfairness to plaintiff from the admission of the disputed testimony of Dr. Richter. Plaintiff was permitted to, and did, respond by means of an affidavit that supplemented Dr. Warner's testimony. Although the Court suggested the possibility, plaintiff did not seek a continuance, seek to recall Dr. Warner (for additional direct), or seek to recall Dr. Richter (for additional cross). Furthermore, because Dr. Warner testified at some length at the trial, the Court was able to assess his credibility; indeed, as noted elsewhere, it had a generally favorable view of Dr. Warner, his qualifications, and his testimony, although it disagreed with his ultimate conclusion that the standard of care was breached. The fact that the evidence came in through affidavit, rather than live, was thus not prejudicial. Finally, plaintiff's claim that the Court never read the affidavit is without foundation, to put it politely.[5] Under the circumstances, a new trial based on that issue is not warranted.

### E. Whether the Delay Between the Trial and the Court's Findings Was Unfairly Prejudicial

Plaintiff makes two assertions concerning the delay between the date of the trial and the filing of the Court's findings of fact and conclusions of law. First, plaintiff contends that the

---

[5] The Court, of course, is not required to address every item of evidence presented at trial in its factual findings, and it is unreasonable to draw the inference that anything that was not specifically cited must not have been read.

Court must make a determination whether, in light of the delay since the conclusion of the trial, "it is possible to rectify any errors of fact or law it may determine were made in this case without conducting a new trial." (Pl. Mem. at 19). Because the Court concludes that it did not make any errors of fact or law, no such determination need be made.

Second, plaintiff contends that "the delay between the time of trial in this case and the date on which the findings and conclusions were entered may have made it impossible to fairly review the evidence . . . ." (Pl. Mem. at 2). The Court candidly acknowledges that the length of time between the conclusion of the trial and the written findings was far from ideal. Some degree of delay, of course, is inevitable. In addition, however, this case presented some unusual issues. As explicitly noted in the opinion, both experts were unusually well-qualified and credible, forcing the Court to make a difficult decision that was not made lightly or in haste. Furthermore, the undersigned judge personally, and painstakingly, reviewed all of the evidence in the case, including the medical records, as well as the trial testimony transcripts. In any event, the Court emphatically rejects plaintiff's suggestion that the mere passage of time somehow led it to an erroneous conclusion, or that it is "impossible" at this stage to fairly review the evidence.

## III.    Conclusion

For the foregoing reasons, plaintiff's motion for a new trial is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

Dated:  December 15, 2011