| | |
|---|---|
| CYNTHIA JACKSON, as Administratrix of the ESTATE OF LEONARD J. GIGUERE, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 08-40024-FDS |
| v. ) ) | |
| UNITED STATES OF AMERICA, ) ) | |
| Defendant. ) ) | |

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAYLOR, J.

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. It is, in substance, an action for wrongful death resulting from medical malpractice. Plaintiff Cynthia Jackson is the administratrix of the estate of Leonard Giguere, her father. She alleges that negligent post-operative medical care provided at the United States Department of Veterans Affairs facility in West Roxbury, Massachusetts, caused Mr. Giguere's death.

The case was tried to the Court without a jury. For the reasons set forth below, the Court finds in favor of the United States.

## I.    Introduction

Leonard Giguere was a 58-year-old resident of Worcester, Massachusetts, and a Vietnam veteran. He came to the West Roxbury VA on May 4, 2005, complaining of chest tightness. At the hospital, physicians concluded that he had suffered a myocardial infarction—in common language, a heart attack. They also discovered that Mr. Giguere had a highly unusual anatomy: due to a past trauma, his diaphragm had herniated, and his stomach and part of his colon had migrated into his chest cavity. As a result, his esophagus had a u-turn in it, rather than a straight passage down to his stomach.

His cardiothoracic surgeon, Dr. Michael Crittenden, concluded that Mr. Giguere required

coronary bypass surgery.  That surgery took place on May 6.  It proceeded normally, and Mr. Giguere was sent to the surgical intensive care unit to recover.

A common result of major surgery is an ileus:  a blockage of the gastrointestinal tract so that food, liquids, or gas cannot pass.  Mr. Giguere developed an ileus at some point after the surgery.  Because gas and other material from his upper digestive tract could not pass through his system, his stomach became distended.  For persons with a normal anatomy, a distended stomach normally produces a swollen and tender abdomen.  When Mr. Giguere's stomach distended, however, it pressed against his left lung and heart, causing pulmonary and cardiac stress.

A nasogastric ("NG") tube inserted through the esophagus into the stomach would have provided a possible means of suctioning gas or fluid and relieving the pressure, although it would not have resolved the ileus.  Dr. Crittenden attempted after the surgery to insert an NG tube, but was not successful in inserting the tube past the u-turn in the esophagus.  Because an ileus normally resolves on its own, and because continued efforts to insert the tube posed a risk of perforation of the esophagus, Dr. Crittenden adopted what was in essence a wait-and-see approach, and did not make further efforts to insert a tube over the next two or three days.

The ileus, however, did not resolve, and Mr. Giguere's condition worsened.  After a consultation, Dr. Elihu Schimmel, a gastroenterologist, recommended fluoroscopic insertion of an NG tube (that is, with the assistance of x-ray imaging).  On May 10, Dr. Stephen Gerzof, a radiologist, attempted to perform the procedure.  During the procedure, Mr. Giguere vomited; he aspirated the vomited material; and in the process he suffered another, and fatal, heart attack.

Plaintiff contends that Mr. Giguere died as a result of medical malpractice.  Both sides presented well-qualified experts on the issue.  Both medical experts gave credible testimony in most respects.  The essential disagreement was whether the physicians should have been more proactive in order to deal with the ileus before it worsened.

Dr. Andrew Warner, plaintiff's expert, is the Chairman of the Department of Gastroenterology at the Lahey Clinic and an Associate Professor of Medicine at Tufts School of

Medicine and an instructor at Harvard Medical School. Dr. Warner testified that Dr. Crittenden should have consulted with a gastroenterologist earlier in the post-operative period, and that the physicians should have attempted the insertion of an NG tube, by endoscopic means if necessary, at the first indication of a possible ileus. He also testified that as soon as symptoms of an ileus developed, Mr. Giguere should not have been given food or water and should have been taken off narcotic painkillers. He concluded that Mr. Giguere died because his untreated ileus caused his stomach to distend, compressing his heart and lungs, and that the resulting stress, coupled with the May 10 attempt to insert the tube, led directly to his fatal heart attack.

Dr. James Richter, defendants' expert, is a gastroenterologist at Massachusetts General Hospital, where he is the Director of Gastroenterology Quality Management, and an Associate Professor of Medicine at Harvard Medical School. Dr. Richter testified that a post-operative ileus almost always resolves in a few days, and that because of Mr. Giguere's fragile state, further attempts to insert a tube were to be avoided if possible. He testified that the normal course of treatment was to give the patient a little bit to eat if he could tolerate it, and try to get him out of bed and moving around to try to resolve the ileus. He further testified that when the ileus did not resolve, the options (including intubation) were difficult and dangerous given Mr. Giguere's anatomy and medical condition. He concluded that the course of action taken by the physicians was appropriate under the circumstances, and in accordance with the relevant standard of care.

This case not only involves a tragic death, but a difficult set of issues. With the benefit of hindsight, it seems likely that a different course of treatment might have led to a different outcome. But hindsight, of course, is not the standard by which the physicians' decisions should be judged. Even without that hindsight view, Mr. Giguere may have received less-than-perfect care. But that, too, is not the standard. Rather, the issue whether Mr. Giguere's physicians deviated from the standard of care—that is, the "care and skill of the average member of the profession practicing the specialty, taking into account the advances in the profession." *Brune v. Belinkoff*, 354 Mass. 102, 109 (1968). This standard "does not require physicians to provide the

3

best care possible," but instead effectively sets a minimum level of care. *Palandjian v. Foster*, 446 Mass. 100, 105 (2006).

The Court concludes, in substance, that the conservative approach adopted by the VA physicians did not breach the standard of care. The approach taken by the physicians was within the range of accepted medical practice. Dr. Warner's viewpoint, while generally credible, in effect represents how a physician with a relatively high degree of skill and foresight would have approached the issue. In the ultimate analysis, Dr. Warner's approach was likely "right," in the sense it was more likely that the patient would have survived had his suggested course of conduct been followed. But, as noted, that is not the precise issue to be decided; it is whether the conduct of the physicians fell below the standard of care. The Court cannot conclude, on the record before it, that they deviated below that standard. Judgment will therefore enter for the United States.

## Findings of Fact

### A.    The Parties

1.    Leonard Giguere was a resident of Worcester, Massachusetts. (Tr. I: 45-46). Mr. Giguere served in the United States Army starting on May 9, 1967, and was stationed for part of his service in Vietnam. (Ex. 6). He was released from active duty on December 22, 1968, but continued to serve in the Army reserves until May 1, 1973, when he was honorably discharged. (*Id.*).

2.    Mr. Giguere died of cardiac arrest on May 10, 2005, at the United States Department of Veterans Affairs medical facility at West Roxbury, Massachusetts (the "West Roxbury VA hospital"). (Ex. 3 at 45-48).

3.    At the time of his death, Mr. Giguere was 58 years old. (Ex. 2).

4.    Cynthia Jackson is the daughter of Leonard Giguere and the administratrix of his estate. (Ex. 1).

5.    Kimberly Giguere is the daughter of Leonard Giguere. (Tr. I: 1-46).

6. Michael Crittenden, M.D., is a cardiothoracic surgeon who worked at the West Roxbury VA hospital in May 2005. (Tr. II: 95-96). He performed a coronary artery bypass graft ("CABG") surgery on Mr. Giguere on May 6, 2005, and oversaw his post-operative care. (Tr. II: 117-119)

7. Elihu Schimmel, M.D., is a gastroenterologist who worked at the West Roxbury VA hospital in May 2005. (Tr. IV: 110-111). He consulted with Dr. Crittenden on Leonard Giguere's gastrointestinal condition. (Tr. IV: 114-42).

8. Pericles Chrysoheris, M.D., is a physician who was a general surgery resident in the Boston University Medical School in May 2005. (Tr. II: 97). He served a rotation in the cardiothoracic service of the West Roxbury VA hospital and was under the supervision of the physicians in that service. (Tr. II: 97). For these purposes, he is an employee and agent of the United States.[1]

9. Stephen Gerzof, M.D., is a radiologist who worked at the West Roxbury VA hospital in May 2005. (Tr. II: 7). He attempted to conduct a nasogastric ("NG") tube insertion on Mr. Giguere on May 10, 2005. (Tr. II: 48-66).

10. The United States is the appropriate defendant in this lawsuit.

**B.    Wednesday, May 4**

11. When he awoke on the morning of May 4, 2005, Leonard Giguere felt tightness in his chest. (Ex. 3 at 147-50). His blood pressure was elevated. (*Id.*). He asked his daughter, Kimberly, to drive him to the West Roxbury VA hospital. (Tr. I: 50, 60).

12. Mr. Giguere was admitted to the hospital on May 4 complaining of exhaustion, chest tightness, and elevated blood pressure. (Ex. 3 at 147-51).

---

[1] In response to a question about whether Dr. Chrysoheris was an employee of the VA hospital, Dr. Crittenden equivocated. (Tr. II: 96). He stated that Dr. Chrysoheris was not technically an employee of the hospital, but rather was an employee of Boston University Medical School. (*Id.*). He noted, however, that Dr. Chrysoheris worked at his direction and so, in that sense, they were employees. (*Id.*). No other evidence on the topic was submitted. Because the United States does not appear to dispute the point, the Court will treat Dr. Chrysoheris as an employee and agent of the United States.

13. Mr. Giguere's underlying medical conditions were obesity, hypertension, hyperlipidemia, metabolic syndrome (pre-diabetes), hiatal hernia, bilateral carpal tunnel syndrome, and retinal detachment in the right eye. (Ex. 3 at 133-38). He also had a history of tobacco use. (*Id.*).

14. Mr. Giguere struggled to manage his diet and to maintain regular exercise, although he received nutritional, weight loss, and lifestyle counseling from his regular physicians. (Ex. 3 at 154-72; Tr. II: 213-15).

15. After blood testing and evaluation, it was determined that Mr. Giguere had suffered a lateral wall myocardial infarction, commonly referred to as a heart attack. (Ex. 3 at 119-38; Tr. II: 203-07).

16. A chest x-ray on May 4 revealed that Mr. Giguere had a major abnormality, which consisted of a "markedly high riding left diaphragm with fundal bubble seen at the level of the left hilum." (Ex. 3 at 345; Ex. 4; Tr. II: 108-09, 212-13, 216). This suggested that Mr. Giguere had suffered a traumatic diaphramatic hernia and that a portion of his intestinal tract had migrated to his upper left chest cavity. (Ex. 3 at 345; Ex. 4; Tr. II: 108-09; Tr. III: 83-85).

17. A subsequent CT scan confirmed that Mr. Giguere had suffered a severe eventration of the left diaphragm; his stomach, and part of his colon, had migrated into his thoracic cavity. (Ex. 3 at 346-47; Tr. II: 109, 116). As a result, his esophagus made a u-turn upward into his stomach, instead of a direct downward path as in patients with a normal anatomy. (Ex. 3 at 346-47; Tr. II: 75-77, 214-18).

## C.   <u>Thursday, May 5</u>

18. A catheterization of Mr. Giguere's main arteries was performed and he was found to have severe three-vessel cardiac disease. (Ex. 3 at 122; Tr. II: 208, 210-12).

19. Dr. Crittenden concluded that Mr. Giguere was suffering from acute coronary syndrome, putting him at significant risk for having another, potentially fatal, heart attack within days

or weeks.  (Tr. II: 208-10).

20.  Dr. Crittenden also concluded that Mr. Giguere was in immediate need of coronary artery bypass graft surgery.  (Tr. II: 113-14).  CABG surgery involves using conduits taken from other parts of the body—such as veins from the leg or an artery from the chest—to bypass the blockages in the native coronary artery.  (*Id.* at 106-07).

21.  Mr. Giguere was rated as an ASA IV, which meant that he had severe systemic heart disease that was a constant threat to his life.  (Ex. 3 at 109; Tr. II: 212; Tr. IV: 33-34).[2]

22.  Dr. Crittenden was concerned about the abnormal arrangement of Mr. Giguere's digestive system because of its potential to impair his ability to perform CABG surgery.  (Tr. II: 112,  216-217).

23.  Dr. Crittenden discussed the results of the CT scan with Mr. Giguere.  (Tr. II: 109-10).  Mr. Giguere advised him that he had been in an accident while he was serving in Vietnam many years earlier.  (Tr. II: 109-10, 214-18; Tr. III: 6-9).  Mr. Giguere had sustained blunt trauma to his abdomen during this accident, which provided a possible explanation for the abnormality.  (Tr. II: 75-77, 214-18, Tr. III: 6-9).

24.  Dr. Crittenden concluded that Mr. Giguere did not have gastrointestinal complications sufficient to preclude the surgery.  (Ex. 3 at 173, 134, 118; Tr. II: 111-12, 214-18, Tr. III: 6-9).

25.  Because of Mr. Giguere's acute coronary syndrome and his worsening heart condition, Dr. Crittenden decided to go forward with the surgery.  (Ex. 3 at 173; Tr. III: 11-12).

---

[2] The ASA physical status classification system is a system for assessing the fitness of patients before surgery.  It was developed by the American Society of Anesthesiologists (ASA).  The classification sytem has six physical status classifications:

I.     A normal healthy patient.
II.    A patient with mild systemic disease.
III.   A patient with severe systemic disease.
IV.    A patient with severe systemic disease that is a constant threat to life.
V.     A moribund patient who is not expected to survive without the operation.
VI.    A declared brain-dead patient whose organs are being removed for donor purposes.

American Society of Anesthesiologists, *ASA Physical Status Classification System*, June 29, 2010, http://www.asahq.org/clinical/physicalstatus.htm.

26. Dr. Crittenden discussed the need for the surgery and its risks and alternatives with Mr. Giguere, and obtained his consent for the procedure. (Ex. 3 at 116-17, 134, 173, 210, 208, 202; Tr. II: 218; Tr. III: 6-9).

**D.    Friday, May 6**

27. Because of concerns about possible perforation of Mr. Giguere's esophagus, and other potential complications that could arise with his unusual anatomy, Dr. Crittenden elected not to use a transesophageal echocardiogram ("TEE"). (Ex. 3 at 103; Tr. II: 118-19, 219-22). A TEE is a device typically employed during heart surgery that passes through the esophagus to allow for a better view of the heart. (Ex. 3 at 103; Tr. II: 219-22).

28. Dr. Crittenden discussed that decision and Mr. Giguere's unusual anatomy with his surgical team, including the anesthesiologist, and they were all aware of Mr. Giguere's condition. (Ex. 3 at 103; Tr. II: 118-19, 219-22).

29. A gastrointestinal specialist was not present during the surgery. (Tr. II: 117).

30. The CABG surgery was completed without complication. (Ex. 3 at 205-07). Mr. Giguere was then transferred from the operating room to the surgical intensive care unit ("SICU") for recovery. (Ex. 3 at 102, 173; Tr. III: 12).

31. The surgery was performed with general anesthesia. Narcotic painkillers, beginning with morphine, were administered post-surgery. (Ex. 3 at 496-98).

32. Standard medical practice is to insert an NG tube post-operatively. (Tr. II: 120-22). This is normally a simple medical procedure. (Ryzhenkova Dep. at 82). An NG tube is inserted primarily to prevent aspiration during the removal of the endotracheal tube. (Tr. III: 16-17; Tr. IV: 13-14).

33. The anesthesia team attempted to insert an NG tube post-operatively in Mr. Giguere's esophagus and stomach. (Ex. 3 at 102, 173; Tr. III: 12). The NG tube was not, however, inserted past the u-turn in his esophagus; it was thus not inserted into the stomach, and thus could not perform its intended function.

34. Dr. Crittenden did not immediately check to make sure that the anesthesiologist had inserted the NG tube into Mr. Giguere's stomach. (Tr. II: 120-22).

35. After the surgery was completed, Mr. Giguere was transferred to the SICU at about 2:00 p.m. on May 6. Approximately one hour later, nurse Kathleen Doherty called Dr. Crittenden to the SICU because she was concerned that the NG tube was not functioning properly. (Ex. 3 at 102; Tr. II: 124; Tr. III: 13-15, 19-20).

36. Dr. Crittenden attempted to re-position the NG tube three times. (Tr. II: 124; Tr. III: 19; Ex. 3 at 102).

37. He knew that the tube insertion had failed because he was unable to complete the insufflation test that confirms that the tube has reached the stomach. (Tr. II: 126-28; Tr. III: 13-15).

38. Because he was concerned that he might perforate the esophagus, Dr. Crittenden decided not to make any more attempts to insert the NG tube. (Tr. II: 133-34; (Tr. III: 19-20). A perforated esophagus could result, among other things, in a serious infection requiring surgery that would present a significant risk to Mr. Giguere because of his fragile condition. (Tr. III: 13-15, 19-21).

39. Dr. Crittenden concluded that it was Mr. Giguere's unusual anatomy that was preventing the placement of the NG tube. (Tr. III: 13-15, 19-21). He also noted that Mr. Giguere was asleep and that unless he swallowed to help the tube go down, further attempts at advancement might injure him. (Tr. III: 22).

40. Dr. Crittenden decided to defer extubation of the endotracheal tube until the following morning, when members of the surgical team would be available to intervene if there were problems with the extubation. (Ex. 3; Tr. III: 22-25).

E.    **Saturday, May 7**

41. At about 10:30 a.m., on Saturday, May 7, Dr. Crittenden, two other physicians, the SICU nurse, and an anesthesiologist extubated Mr. Giguere without complication. (Ex. 3 at 97;

42. For the remainder of the day and evening of May 7, Mr. Giguere exhibited a normal post-operative recovery course without any remarkable complications. (Ex. 3 at 93-96). He was reported to be awake, alert, and stable. (*Id.*). He was moved out of his bed and into a chair and sat comfortably. (*Id.*; Tr. III: 41-44).

43. Mr. Giguere was monitored closely by nurses and residents during the post-operative period. (Tr. II: 159). Dr. Crittenden also saw Mr. Giguere as part of his rounds during that period. (Tr. II: 166).

44. Mr. Giguere received his last dosage of morphine for pain at 8:55 p.m. on May 7. (Tr. III: 55-58; Ex. 3 at 505, 512). From that point, he was administered Percocet (a combination of oxycodone and acetaminophen) for pain, with the last dose given at 7:41 a.m. on May 9. (*Id.*).

45. Mr. Giguere was given Metoprolol, a beta blocker used to slow the heart rate, for the first time on May 7. (Ex. 3 at 505). He was kept on this beta blocker throughout his time at the hospital. (Ex. 3 at 505, 506, 509, 510, 512-517).

46. At about 6:30 p.m. on May 7, Dr. Zara Cooper ordered "ADAT," or "advance diet as tolerated." (Ex. 3 at 96; Tr. III: 174-75).

47. A patient's normal progression on an "advance diet as tolerated" order is to begin with clear liquids. (Tr. III: 174-75). If those are tolerated, the patient is advanced to a full liquid diet, and then eventually to a regular cardiac diet, which is a low-fat, low-sodium, low-cholesterol meal. (*Id.*).

**F.    Sunday, May 8**

48. On Sunday, May 8, Mr. Giguere continued to progress within normal post-operative parameters. (Ex. 3 at 86-88, 90-93; Tr. III: 46-47). He was again able to get out of bed and walked around briefly. (Ex. 3 at 92-93; Tr. III: 46-47).

49. An "ileus" is a disruption or paralysis of the peristalsis or propulsive action of the bowel.

(Tr. III: 92-93).

50. Having an ileus is a common post-operative condition after general anesthesia and major surgery. (Tr. III: 43, 92-93). An adynamic ileus is an ileus that persists beyond a normal recovery period. (Tr. III: 93).

51. A typical ileus will resolve within two to four days. (Tr. III: 43).

52. In a person with a normal anatomy, the primary external symptoms of an adynamic ileus are abdominal distention and discomfort. (Tr. III: 93).

53. The principal diagnostic tests that are used to confirm the presence of an ileus are x-rays and CT scans. (Tr. III: 93-94).

54. Among the possible adverse outcomes if an ileus does not eventually resolve are (1) distention to the point of perforation or rupture; (2) infarction, or cut-off of blood supply leading to tissue death; or (3) vomiting leading to possible aspiration. (Tr. III: 95).

55. An NG tube can help relieve the symptoms of an ileus, although it does not promote its resolution. (Tr. III: 17, 97; Tr. IV: 14, 19-22, 82).

56. An NG tube allows the stomach contents to be evacuated and can be used to relieve distention in the stomach. (Tr. II: 119-20).

57. Mr. Giguere received a chest x-ray at around 4:30 a.m. on May 8. (Ex. 3 at 351). According to the radiologist's report, the x-ray showed "a lucency in the left lower lung which could be due to bowel." (Ex. 3 at 351; Tr. II: 29-30). The lucency was due to gaseous distention of the stomach. (Tr. II: 30).

58. At 6:51 a.m. on May 8, Dr. Cooper ordered a low-sodium, low-fat, low-cholesterol, "full liquid" meal. (Ex. 3 at 477; Tr. III: 192).

59. A progress note signed by nurse Barbara Forsythe at 7:28 a.m. indicated that Mr. Giguere "tol[erated] clear liquids with no problems." (Ex. 3 at 93; Tr. III: 49, 173-74). The same progress note indicated that Ms. Forsythe's "plan" for Mr. Giguere was to "advance [his] diet." (*Id.*).

60.     The same progress note indicated that the previous evening (that is, May 7), Mr. Giguere had complained of "persistent incisional pain, finally relieved by [morphine given at 8:55 p.m. on May 7] and percocet."  (Ex. 3 at 93).

61.     The nursing progress notes for May 8 indicated that Mr. Giguere was also wheezing.  (Ex. 3 at 92-93).  Dr. Crittenden believed that this was normal because Mr. Giguere was a former smoker and had other pulmonary risk factors.  (Tr. III: 47, 72).

62.     Chest and abdomen x-rays were taken at around 11:50 a.m. on May 8.  The radiologist's report indicated that they showed "dilated loops" of the large and small bowels that could be attributed to "nonspecific ileus."  (Ex. 3 at 352-53; Tr. II: 34).

63.     Mr. Giguere passed a "large amount of flatus" on the afternoon of May 8 and had bowel sounds.  (Tr. III: 45-46; Ex. 3 at 92-93).  The presence of flatus was a sign that intestinal function may have been returning to normal.  (Tr. III: 46-47).

64.     Dr. Crittenden decided that because Mr. Giguere was passing flatus, had bowel sounds, was sipping fluids comfortably, and was getting out of bed and walking around, he was progressing normally.  (Tr. III: 46-47).

65.     Dr. Crittenden was concerned that any further attempt to insert an NG tube might injure Mr. Giguere (through perforation of the esophagus or further insufflation of the distended intestine).  (Tr. III: 19-21, 77).[3]

66.     X-ray images and radiology reports are available electronically to any clinician at the hospital.  (Tr. II: 10-11).  Dr. Crittenden reviewed the radiology images and reports as part of his rounds.  (Tr. II: 168, 172;  Ex. 3 at 93, 96).

67.     Around 7:00 p.m. on May 8, nurse John O'Sullivan recorded that Mr. Giguere consumed 60% of his diet.  (Ex. 3 at 262, Tr. III: 180).  Nurse O'Sullivan also noted that Mr. Giguere consumed 200 cc's of clear liquids during that same meal.  (Ex. 3 at 257B; Tr.

_____

[3] Dr. Crittenden's testimony is corroborated by Mr. Giguere's later statement to Dr. Schimmel that a surgeon had told him that a NG tube could not be advanced safely.  (Ex. 3 at 81; Tr. IV: 120).

III: 185).[4]  Although it is unclear, it is likely that nurse O'Sullivan intended to indicate that Mr. Giguere ate 60% of a full liquid tray and 200 cc's of clear liquids.  (Tr. III: 185-86).

68.    At about 9:15 p.m. on May 8, Dr. Chrysoheris signed an order that Mr. Giguere's diet was to be advanced as tolerated.  (Ex. 3 at 92; Tr. III: 176).

69.    Mr. Giguere was never served, and did not eat, solid food while at the West Roxbury VA.

70.    In the same order, Dr. Chrysoheris ordered "morphine, percocet for pain."  (Ex. 3 at 92).
As noted, Mr. Giguere did not receive a dosage of morphine after the evening of May 7.  (Ex. 3 at 505, 512).

### G.    Monday, May 9

71.    At about 5:30 a.m. on May 9, Mr. Giguere received a chest x-ray.  (Ex. 3 at 354).  The accompanying radiologist's report reported no change.  (*Id.*).

72.    At 7:41 a.m. on May 9,  Mr. Giguere was given Percocet for incisional pain.  (Ex. 3 at 512).  He did not receive another dosage of Percocet after that.  (*Id.*).

73.    At about 8:05 a.m. on May 9, Dr. Chrysoheris again signed an order indicating "advance diet as tolerated."  (Ex. 3 at 90).

74.    At about 9:15 a.m. on May 9, Mr. Giguere received an abdominal x-ray.  (Ex. 3 at 355).
The radiologist reported that "[t]here is persistent distended gas-filled small bowel and colon with minimal gas seen in the rectum," that "[c]hanges have not significantly changed [sic] since the prior study and most likely represent ileus paralytic."  (*Id.*).

75.    At about 10:00 a.m. on May 9, Mr. Giguere was transferred from the SICU to the Progressive Care Unit ("PCU").  (Ex. 3 at 85).

76.    A nursing progress note signed at 10:51 a.m. on May 9 indicated that Mr. Giguere's abdomen was "distended," and that he reported feeling "very full."  The notes contain the entry "nutrition consult – ? NPO [nothing by mouth]" and an entry that he was "kept NPO

---

[4] Other nurses who had given Mr. Giguere liquid meals had recorded the amount consumed in terms of cubic centimeters, not as a percentage of the meal.  (Tr. III: 182).

except ice chips." (Ex. 3 at 86-88). The note also indicates that Mr. Giguere was given a suppository laxative (Dulcolax) without results, and that he was burping and passing flatus. He was also tachycardic. (*Id.*).

77. The same progress note indicated that he had "incisional" pain and was taking percocet for relief. (Ex. 3 at 87).

78. Later that morning, Mr. Giguere complained of heartburn, which improved when he consumed ice chips. (Ex. 3 at 86).

79. By the morning of May 9, Dr. Crittenden had become concerned that Mr. Giguere had developed an ileus that might not resolve. (Tr. II: 183-84).

80. A progress note by nurse Lyuba Ryzhenkova signed at 1:13 p.m. on May 9 indicated that Mr. Giguere "tolerates ice chips" and that he was on a "cardiac diet." but that he "did not have anything solid yet." (Ex. 3 at 85). Nurse Ryzhenkova also noted that his abdomen was "distended" and "taut" and that he was short of breath, "even when . . . talking." (*Id.*).

81. At about 1:15 p.m. on May 9, Mr. Giguere vomited 60cc of black homogeneous emesis . (Ex. 3 at 86). He did not have heartburn or nausea after he vomited. (*Id.*).

82. At about 1:30 p.m. on May 9, an order was placed for a consultation with the gastroenterology department. (Ex. 3 at 80-84; Tr. II: 184-85).

83. Dr. Schimmel and Dr. Reina Pai of the gastroenterology department examined Mr. Giguere on the afternoon of May 9. (Ex. 3 at 80-84). Both physicians noted that Mr. Giguere had experienced distention, nausea, and vomiting earlier in the day. (*Id.*). They also noted that he "seems to have progressed today" and was now passing gas and having bowel movements. (*Id.*). Dr. Schimmel also reviewed the radiology reports and films. (Ex. 3 at 81).

84. The plan entered by Dr. Schimmel and Dr. Pai at about 4:30 p.m. on May 9 was as follows:

Agree with supportive care as you are doing: minimizing narcotics, [out of bed] as tolerated, frequent turning in bed, aggressive electrolyte repletion. At this point would not place NG tube. Given acute angle of stomach with eventration NG tube will likely not be easily placed and there is a risk of perforation into mediastinum. If patient's condition worsens, would likely need radiographic study (barium swallow) to assess anatomy before NG placement. If absolutely necessary, would favor doboff tube as opposed to ng for decompression (less chance of perforation)[.] Radiology could potentially place NG over guidewire under [fluoroscopy] if needed. Endoscopic [placement] would result in additional air in the upper gi tract, would not be the method of choice for placement.

(Ex. 3 at 84).

85. Dr. Schimmel also signed a note at 4:52 p.m. on May 9 that included the following:

As reported to [Mr. Giguere] by the unidentified intraoperative surgeon [presumably, Dr. Crittenden]: Don't put a tube into the stomach (blindly) because of the risk of perforation.

Currently, he appears to have bypassed the need for NG tube. If his abdominal dilation worsens, we recommend a barium swallow (NOT a full UGIS) to see the course of the esophagus and the probable hairpin turn back up into the chest.

Flu[o]roscopic placement after such a study is possible.
EDG would not be safe (too much air is insufflated) or useful (same problem of getting down around gastric displacement[)].

The best outcome would be to extend his hospital stay to allow spontaneous recovery of motility and elective evaluation of the eventration at a later stage. There is no radiological evidence (yet) of ischemic compromise.

(Ex. 3 at 81).

86. In making this recommendation, Dr. Schimmel was not aware that Mr. Giguere had vomited that afternoon at about 1:15 p.m., which would have temporarily decompressed his stomach. (Tr. IV: 126).

87. Mr. Giguere's condition did not improve over the evening of May 9. (Ex. 3 at 78-80). He experienced nausea, another episode of vomiting, more distention, tachycardia (increased heart rate), and mild respiratory distress. (Ex. 3 at 80).[5]

### H. **Tuesday, May 10**

88. At about 8:50 a.m. on May 10, Doctors Pai and Schimmel noted Mr. Giguere's

---

[5] Mr. Giguere's heart rate fluctuated between 100 and 115. (Ex. 3 at 80, 83, 85).

"worsening condition" and recommended placement of an NG tube by fluoroscopy in order to permit decompression of his stomach. (Ex. 3 at 80, 79).

89. Dr. Stephen Gerzof, a radiologist, was consulted on an emergency basis. (Tr. II: 42-44). At about 9:00 a.m., Mr. Giguere was taken to the radiology department. (Ex. 3 at 357-357B).

90. A progress note entered by Dr. Denise Gee, a general surgeon, at about 9:30 a.m. on May 9 indicated that an earlier unsuccessful attempt had been made to place an NG tube, that "[a] decision was made to hold on placing [the tube] blindly" because "the [patient] seemed to be improving from ileus and even tolerated some [liquids] post op, but has increased distention to [sic] today with some [respiratory] distress and mild tachycardia." (Ex. 3 at 78).

91. Dr. Gerzof decided to attempt to insert an NG tube fluoroscopically. (Ex. 3 at 357-357B).

92. In order to facilitate the procedure, Dr. Gerzof had the SICU nurses place the NG tube as far as they could. (Tr. II: 45). The NG tube was advanced by the SICU nurses to approximately the same location as it had been placed immediately following surgery. (Tr. II: 80). Dr. Gerzof opined that this was likely the spot right above the 180-degree turn, and that is why both times the NG tube could not be advanced further than that point. (*Id.*).[6]

93. Dr. Gerzof briefly spoke with Mr. Giguere before the procedure and explained what he was going to attempt to do. (Tr. II: 48). Mr. Giguere appeared ill, frightened, and in distress. (*Id.*). Mr. Giguere seemed to understand what was going on and was able to

---

[6] Dr. Gerzof also concluded that the NG tube stopped about one or two centimeters above the 180-degree curve based on his own merging of the CT scans, which he viewed before the procedure, and the plain films. (Tr. II: 84-85).

cooperate with Dr. Gerzof. (*Id.*).[7]

94.     Dr. Gerzof observed that Mr. Giguere's esophagus had collapsed before he began
        placement of the NG tube. (Tr. II: 61).

95.     Dr. Gerzof had difficulty passing the NG tube fluoroscopically. (Tr. II: 54; Ex. 3 at 357).
        He was only able to advance the NG tube about one centimeter when it engendered a
        vomiting reflex. (*Id.*). Mr. Giguere vomited 50 to 100 cc's of dark brown-blackish, very
        foul-smelling viscous fluid. (*Id.*).

96.     Dr. Gerzof testified that it was possible that Mr. Giguere's gag reflex might have been
        more sensitive because his stomach was distended. (Tr. II: 54-55, 57).

97.     Dr. Gerzof stopped the procedure to make sure that Mr. Giguere did not aspirate any
        fluid. (Tr. II: 57-58).

98.     After clearing some of the vomit, Dr. Gerzof continued with his attempt to
        fluoroscopically place the NG tube. (Tr. II: 58; Ex. 3 at 357). However, with only a
        slight advancement of the tube, Mr. Giguere again vomited similar material. (*Id.*).

99.     Dr. Gerzof testified that the dark, foul-smelling material that Mr. Giguere vomited up
        "might have been dead gut," indicating that he may have already suffered an infarction in
        his gastrointestinal system. (Tr. II: 58).

100.    Dr. Gerzof could tell that the vomitus had come from the stomach, but could not tell
        whether it had just then exited the stomach into the esophagus or whether a small amount
        had trickled into the esophagus over the preceding hours. (Tr. II: 59-60).

101.    Dr. Gerzof noted that there may have been some fluid already in the esophagus, but had
        there been a significant amount, it would have already been pouring out of the NG tube,
        which was already in the esophagus. (Tr. II: 60-61).

102.    After Mr. Giguere had vomited for the second time, Dr. Gerzof decided that attempting to

---

[7] Dr. Gerzof testified that he did not remember if he asked Mr. Giguere to swallow while performing the procedure, but he testified that normally he does ask patients to swallow when inserting an NG tube. (Tr. II: 52).

insert the tube this way was not going to be successful, and that he would need to use a J-tip guide wire to place the tube properly. (Tr. II: 58-59; Ex. 3 at 357). A J-tip guide wire has significantly less volume than the NG tube, and is more flexible and less stiff. (*Id.* at 63-64).

103. Dr. Gerzof intended to use the J-tip guide wire to navigate through the sharp curve at the cardioesophageal junction. (Tr. II: 58, 63-64). He intended to advance the NG tube along the guide wire and into the stomach, and then remove the guide wire. (*Id.*).

104. Dr. Gerzof took the guide wire and advanced it through the NG tube, which remained in the patient. (Tr. II: 63; Ex. 3 at 357).

105. As Dr. Gerzof attempted to advance the guide wire through the NG tube and towards the stomach, Mr. Giguere's heart rate dropped. (Tr. II: 64-65; Ex. 3 at 357).

106. Dr. Gerzof turned on the lights and found that Mr. Giguere had vomited more black fluid and was turning blue. (Tr. II: 65). Mr. Giguere was unresponsive and was not breathing. (*Id.*).

107. It was later determined that Mr. Giguere had experienced a sudden drop in blood pressure, followed by a cardiac arrest. (Ex. 3 at 357-357B).

108. Dr. Gerzof called an emergency code. (Ex. 3 at 78). The cardiac surgery team, general surgery team, medicine team, and nurses responded. (Ex. 3 at 78; Tr. II: 66). The anesthesia team intubated Mr. Giguere and a large amount of dark fluid came out of his trachea. (*Id.*). CPR was started and carried on for thirty minutes. (*Id.*).

109. Despite these efforts, the teams were unable to revive Mr. Giguere. He was pronounced dead at 11:10 a.m on May 10. (Ex. 3 at 78; 357-357B).

110. After reviewing the CT scans of Mr. Giguere's stomach and colon, Dr. Gerzof believed that he could "push and push" an NG tube, but that "[i]t would never go anywhere," given the unusual anatomy of Mr. Giguere's intestinal tract. (Tr. II: 82).

### I.     Wednesday, May 11

111.   On May 11, an autopsy was performed on Mr. Giguere.  The autopsy determined that the

cause of death was as follows:

Cardiac arrest:  acute left ventricular myocardial infarction (hours to days).
Hypostatic, compressed left lung[.] Secondary to gastric and colonic eventration
through non-patent left diaphragm hiatus, secondary to abdominal ileus of right
colon with gaseous obstipation and abdominal pressure.

(Ex. 3 at 381).

112.   It took almost an hour at the autopsy to remove the stomach and colon out through the

diaphragm because of very dense, white, fibrous tissue that had formed in the area and

bound the organs over the years.  (Tr. II: 70).

113.   The stomach and esophagus were also found to be wrapped around each other, meaning

any obstruction of Mr. Giguere's stomach would cause obstruction in the colon, and vice-

versa.  (*Id.* at 76).

### J.     Expert Testimony as to Failure to Meet Standard of Care

#### 1.     Background of Experts

##### a.     Andrew Warner, M.D.

114.   Dr. Andrew Warner testified as an expert for the plaintiff.

115.   Dr. Warner has a medical degree from Chicago Medical School.  (Tr. III: 79-80).  He is

the Chairman of the Department of Gastroenterology at the Lahey Clinic in Burlington,

Massachusetts.  (Tr. III: 78-79).  At the time of trial, he was an Associate Professor of

Medicine at Tufts University School of Medicine and a Clinical Instructor at Harvard

Medical School.  (Tr. III: 80).

##### b.     James M. Richter, M.D.

116.   Dr. James M. Richter testified as an expert for the defendant.

117.   Dr. Richter has a master's degree from the University of Texas Health Science Center at

Dallas and a medical degree from University of Texas Southwestern Medical School.  (Tr.

IV: 5).  At the time of trial, he was an Associate Professor of Medicine at Harvard

Medical School.  (Tr. IV: 5).  He is also the Director of the Quality Management and Performance Improvement Program of the Digestive Disease Section at Massachusetts General Hospital in Boston.  (Tr. IV: 5).

### 2.    The Relevant Standard of Care:  Cardiothoracic Surgery vs. Gastroenterology

118.    The only expert testimony was provided by the two gastroenterologists, Dr. Warner and Dr. Richter.  Dr. Crittenden, however, is a cardiothoracic surgeon.  Presumably, the relevant standard of care as to Dr. Crittenden is not that of a gastroenterologist, but that of a cardiothoracic surgeon performing postoperative care.  Indeed, implicit in plaintiff's position that Dr. Crittenden should have sought an earlier consultation with a gastroenterologist is the assumption that such a specialist would have expertise that Dr. Crittenden did not possess.  No evidence has been introduced as to the standard of care for cardiothoracic surgeons specifically.

119.    Nonetheless, expert testimony was offered by both sides as to whether Dr. Crittenden (among others) complied with the standard of care.  The government did not object to that testimony on the grounds that a gastroenterologist cannot testify as to the standard of care of a cardiothoracic surgeon, and did not move for a directed verdict on the grounds that no expert testimony was offered as to Dr. Crittenden.  Under the circumstances, the Court will simply examine the question whether the care provided by the physicians who attended Mr. Giguere complied with the standard of care as described by the two expert gastroenterologists.

### 3.    Standard of Care for Treating a Post-Operative Ileus

120.    As noted, almost every person who has had general anesthesia and a significant operation will undergo some degree of post-operative ileus.  Mr. Giguere's unusual anatomy meant that if he developed an ileus, he was at a higher risk of an adverse outcome.  In particular, distention of the stomach in his chest cavity could cause cardiopulmonary distress.

121.    Plaintiff's expert, Dr. Warner, testified that Mr. Giguere died primarily because he had an

untreated ileus which—because of his unusual anatomy—caused his stomach and intestines to become distended, thereby compressing his already sensitive heart and lungs. (Tr. III: 142-43).

122. Dr. Warner testified, in substance, that the physicians should have been more proactive with Mr. Giguere. (Tr. III: 146, 148-49). Specifically, he testified that the physicians at the West Roxbury VA did not meet the standard of care because (1) Dr. Crittenden did not insert an NG tube immediately after surgery; (2) Dr. Crittenden did not consult a gastroenterologist as soon as Mr. Giguere exhibited signs of an ileus in order to manage his condition; (3) the physicians did not stop Mr. Giguere from being given any food or drink; and (4) the physicians did not stop giving him opiates at the first signs of an ileus. (Tr. III: 108-09, 136-37).

123. Dr. Warner testified that Dr. Gerzof's attempt to insert an NG tube radiologically on May 10, and the resulting aspiration of vomit, placed undue stress on Mr. Giguere's heart and lungs and essentially caused him to have a fatal heart attack. (Tr. III: 142-43). He also testified that the risk would have been reduced had endoscopic advancement of the NG tube been attempted on May 10, or had the insertion of a tube been attempted at an earlier point. (Tr. III: 143).

124. Defendant's expert, Dr. Richter, testified that the accepted standard of care for managing a post-operative ileus, especially given Mr. Giguere's unusual anatomy and delicate heart condition, was to monitor him carefully and take conservative steps posing the least risk of complications in order to promote spontaneous recovery of the ileus. (Ex. 3 at 109; Tr. II: 208-10, 212; Tr. IV: 22-23, 26, 33-34). Dr. Richter opined that the treatment and attention Mr. Giguere received was within the accepted standard of care. (Tr. IV: 12-13, 15-18, 53).

125. There are essentially four issues: (1) whether Dr. Crittenden should have inserted an NG tube after surgery; (2) whether Dr. Crittenden should have consulted a gastroenterologist

at an earlier point; (3) whether Mr. Giguere should have been given food or drink by mouth once an ileus is suspected; and (4) whether Mr. Giguere should have been taken off of narcotic pain medications at an earlier stage to promote resolution of his ileus. The Court will consider the first two issues together.

### a. Insertion of NG Tube/Consultation with Gastroenterologist

126. Plaintiff contends that it was negligent under the circumstances not to insert an NG tube as soon as an ileus was suspected and that the failure to do so was a substantial contributing cause of Mr. Giguere's death. (Tr. III: 136, 147).

127. The experts agreed that an NG tube is primarily used to prevent aspiration during the removal of the endotracheal tube and only secondarily to relieve the symptoms of an ileus. (Tr. III: 16-17; Tr. IV: 13-14).

128. They also essentially agreed that although suction through an NG tube may provide some relief from the discomfort of distention, it does not promote the resolution of an ileus. (Tr. II: 150-51; Tr. III: 17, 97; Tr. IV: 14, 19-22, 82).

129. Mr. Giguere did not aspirate during the removal of the endotracheal tube. (Tr. IV: 13).

130. Dr. Warner opined that Dr. Crittenden should have known, given the patient's unusual anatomy, that any ileus that led to stomach distention "is going to put enormous stress on the lungs and on the heart and that you have to be extraordinarily careful to make sure that doesn't happen." (Tr. III: 136). For that reason, Dr. Warner opined that "a nasogastric tube should have been placed immediately in the perioperative period." (*Id.*).[8]

131. Dr. Warner testified that if the surgeon was unable to place the NG tube immediately, he should have consulted with a gastroenterologist "sooner." (Tr. III: 137). He testified that "anyone who has . . . a postoperative ileus can get very ill very quickly, and it should be managed by someone who specializes in that," and that given the patient's unusual

---

[8] Dr. Warner also testified that after surgery the physicians should have checked to ensure that the NG tube had been inserted properly, because the x-ray did not show that it had entered the stomach. (Tr. III: 86-91).

anatomy, "you've really got no room for error at all." (Tr. III: 138).

132. Dr. Warner testified that there were multiple methods of inserting a tube, including endoscopically. (Tr. III: 127).

133. "Endoscopy" is a procedure in which a flexible tube coupled with a camera and light source is inserted into the body. (Tr. III: 80).

134. Dr. Warner testified that endoscopic procedures permit the suctioning of air, which the fluoroscopic advancement of an NG tube does not. (Tr. III: 98, 130).[9]

135. Dr. Warner testified that when Dr. Crittenden could not insert the NG tube on May 6, a tube should have been advanced radiologically or endoscopically. (Tr. III: 123, 126-30; 136-37).

136. At approximately 11:00 a.m. on May 7, Mr. Giguere became tachycardic (that is, exhibited an elevated heart rate). (Tr. III: 101). According to Dr. Warner, that was significant because it was a sign of cardiopulmonary stress. (Tr. III: 101-02).

137. Plaintiff contends that Dr. Crittenden should have realized that tachycardia was a sign that Mr. Giguere was developing an ileus and that his heart and lung were being compressed. (Tr. III: 101-04).

138. Dr. Warner testified that the fact that Mr. Giguere had not begun bowel movements or passed gas by 5:00 p.m. on Saturday, May 7, was also significant. (Tr. III: 105-06).

139. According to Dr. Warner, the fact that bowel sounds were present was not significant. (Tr. III: 104).

140. Dr. Warner testified that Mr. Giguere had manifested signs of an ileus by the night of May 7 or the morning of May 8. (Tr. III: 101).

---

[9] A gastrostomy is a procedure where a hole is created through the skin and stomach wall and into the stomach. (Tr. III: 98-99). It can be used to suction air out of the stomach. (Tr. III: 99). It is, however, an invasive and relatively risky procedure that was not standard medical practice under the circumstances. (Tr. III: 99; IV: 29). Neither expert considered gastrostomy to be a first-choice option, presumably because of the risk involved and the difficulties created by the position of the stomach in the chest cavity. Dr. Richter also testified that insertion of a tube rectally was not a viable option. (Tr. IV:28-29).

141. Dr. Warner further opined that "at the first signs of an obstruction," the physicians should have "[done] everything [they could] to put the NG tube down to prevent it from getting worse." (Tr. III: 137, 144).

142. Dr. Warner disagreed with Dr. Schimmel's conclusion that it would be problematic to advance an NG tube endoscopically. (Tr. III: 129-30). In particular, he disagreed that an endoscopic procedure would insert more air and potentially make matters worse. (Tr. III: 130).

143. Dr. Warner testified that the conditions identified by Dr. Schimmel that contraindicated endoscopic placement of an NG tube did not exist on May 6. (Tr. III: 130).

144. Dr. Warner also testified that Dr. Crittenden should have inserted an NG tube or otherwise attempted to relieve the pressure in Mr. Giguere's stomach after viewing the May 8 x-rays, which indicated a growing ileus. (Tr. III: 98-99, 136-38).

145. The consequences of not relieving this pressure were especially great because, due to Mr. Giguere's anatomy, stomach distention could cause cardiopulmonary distress. (Tr. III: 10, 98-99).

146. Dr. Warner testified that by not recognizing the signs of an ileus or consulting a gastroenterologist earlier than May 9, Dr. Crittenden violated the standard of care. (Tr. III: 101, 115, 136-3).

147. Dr. Richter disagreed with Dr. Warner's analysis. In substance, Dr. Richter testified that Mr. Giguere had a complex medical situation, that he was fragile, that he had just had a heart attack and bypass surgery, and that a further operation or additional invasive procedures were to be avoided. (Tr. IV:18, 26). He also testified that inserting an NG tube radiologically is a "potentially dangerous procedure." (Tr. IV: 14).

148. Dr. Richter testified that in the days following surgery, Mr. Giguere exhibited signs that his normal intestinal functions were beginning to return. (Tr. IV: 13, 15-18). He also testified that Mr. Giguere's abdominal distention after surgery was considered to be within

normal post-operative parameters. (Tr. IV: 13, 15-18).

149. Dr. Richter opined that during the recovery period, Mr. Giguere was "carefully monitored" by Dr. Crittenden and the surgical team, by the nurses," and that the "consultation by Dr. Schimmel . . . was prudently moderate, recognizing the complexity of [the patient's] case." (Tr. IV: 14). He concluded that "the case that was rendered was thoughtful, prudent, recognized, kind of careful continuing observation and assessment of a complex and changeable situation and conformed with the standard of care present in the medical community in 2005." (Tr. IV: 14-15, 27-28).

150. Dr. Richter testified that "post-op[erative] ileus almost always resolves in a few days," and that the best course was to give the patient "a little bit to eat" if he could tolerate it, and to "try to get him up and moving around," because "activity is a potent natural stimulant to the effect of peristalsis." (Tr. IV: 18). He further testified that "Dr. Schimmel's recommendations . . . [were] exactly concordant" with standard medical practice. (Tr. IV: 19).

151. Dr. Richter testified that "post-operative ileus is a common event," and that "it resolves usually spontaneously with a wait-and-see approach." (Tr. IV: 19).

152. Dr. Richter testified that "routine nasogastric suction after ileus complicating abdominal surgery does not speed the resolution of the ileus." (Tr. IV: 20). He added, however, that NG tubes "do provide some level of comfort." (Tr. IV: 21).

153. Dr. Richter acknowledged that Mr. Giguere was "at greater risk for the complications of an ileus" because of his unusual anatomy. (Tr. IV: 22).

154. Dr. Richter testified that "ileus to this degree does not occur commonly or overly frequently after a cardiac surgery," and that the "standard of practice would be not to anticipate or to do anything potentially dangerous" in advance of its occurrence. (Tr. IV: 22). He also testified that when "[the ileus] finally did arise, the options were not particularly good." (Tr. IV: 22). Placing NG tubes in patients such as Mr. Giguere is

"difficult, dangerous, and . . . not [a] simple procedure[]."  (Tr. IV: 22).

155.  Dr. Richter testified that in his experience, placing NG tubes into the stomachs of patients with Mr. Giguere's unusual anatomy is usually unsuccessful.  (Tr. IV: 22-23).

156.  Dr. Richter testified that inserting an NG tube into someone with Mr. Giguere's anatomy posed a risk of serious bleeding and perforation of the digestive tract.  (Tr. IV: 22-23, 26).

157.  Dr. Richter testified that Mr. Giguere faced an "underlying constant threat to his life" from the heart disease and the surgery, and that there was a "reasonable likelihood, if not a more than 50/50 [chance]" that the ileus would resolve on its own.  (Tr. IV: 26).

158.  Dr. Richter testified that the option of inserting a tube endoscopically into the stomach raised risks of perforation and bleeding as well as other risks associated with topical anesthesia and infusion of air.  (Tr. IV: 26-27).

159.  Dr. Richter testified that the method chosen to place the NG tube was the "safest and most effective" method under the circumstances.  (Tr. IV: 27-28).

160.  Dr. Richter testified that an NG tube is "designed to go down straight or negotiate curves of up to about 30 degrees" and that it "tends to buckle back on itself" when it "confronts acute angulations."  (Tr. IV: 34).

161.  Dr. Richter testified that there was evidence that the ileus was "reasonably improving," but that on the third or fourth day post-surgery he "really did look worse," and that "the balance of risks and benefits" of different treatment changed at that point.  (Tr. IV: 53).

162.  Based on the above factors, Dr. Richter testified that it was appropriate to wait to insert the NG tube until Mr. Giguere began exhibiting more severe symptoms.  (Tr. IV: 13-14; Tr. III: 3-26; 19-21).

163.  The Court credits the testimony of Dr. Richter that, under the circumstances, Dr. Crittenden did not violate the standard of care by failing to insert an NG tube immediately after surgery.

164.  The Court credits the testimony of Dr. Richter that, under the circumstances, the

physicians did not breach the standard of care by not making further attempts between May 6 and May 10 to insert an NG tube.

165.    The Court credits the testimony of Dr. Warner to the extent that he testified that it would have been a better medical practice for Dr. Crittenden to have consulted with a gastroenterologist at an earlier stage, given Mr. Giguere's unusual anatomy and medical circumstances. The Court does not conclude, however, that Dr. Crittenden violated the standard of care by not doing so. Among other things, there is no evidence that Dr. Schimmel, the gastroenterologist, would have done anything differently had he been consulted before May 9. When Dr. Schimmel was consulted, he noted that he agreed with the "supportive care you are doing" and made no significant changes to the course of treatment, suggesting that he approved of the actions taken to that point.

166.    The Court credits the testimony of Dr. Richter that, under the circumstances, Dr. Crittenden did not violate the standard of care by not consulting with a gastroenterologist at an earlier stage.

### b.    Administration of Food and Drink

167.    Dr. Warner and Dr. Richter expressed opposite views as to whether a post-operative patient in danger of developing an ileus or with signs of an ileus should be given any food or liquids. (Tr. III: 117-19; Tr. IV: 13, 84-85).

168.    Dr. Warner testified that "the first thing you do" for a patient who has an ileus and is not getting better, or who is a cause for concern, is to "stop them from eating or drinking." (Tr. III: 97).[10]

169.    Dr. Warner testified that Mr. Giguere should not have been given anything to eat or drink by mouth once an ileus was suspected. (Tr. III: 115-16, 136-37).

170.    Dr. Warner testified that an instruction to "advance diet as tolerated" was not acceptable

---

[10] He added that "the second thing you do" is to "place a nasogastric tube and suction . . . out" the contents of the stomach, including both fluid and air. (Tr. III: 97-98).

medical practice for someone who showed signs of an ileus.  (Tr. III: 117).  He testified that additional food or drink would accelerate the process by which the bowels can get progressively more distended.  (Tr. III: 118).

171.    Dr. Warner testified that the fact that the patient had been given food and drink made the attempt to insert an NG tube on May 10 more difficult.  (Tr. III: 118-19).  In addition to making the distention worse, it created the potential that the stomach was filled with food, making aspiration more likely and making it more challenging to suction anything out. (Tr. III: 119).[11]

172.    Dr. Warner further opined that the patient's diet should not have been advanced, as any food or fluid intake "is going to accelerate the obstruction, and it's going to make it much more difficult to treat."  (Tr. III: 138-39).  He also testified that the physicians should have checked to ensure that the patient was kept NPO (that is, not permitted to take anything by mouth) from the morning of May 8 afterward.  (Tr. III: 141).

173.    Dr. Warner testified that Dr. Chrysoheris violated the standard of care by advancing Mr. Giguere's diet to liquids.  (Tr. III: 138-41).

174.    Dr. Richter testified that permitting a patient to ingest small amounts of food by mouth, as tolerated, is a "recommended" course of treatment, "because eating is a natural stimulant to bowel motility."  (Tr. IV: 13).

175.    He also testified that eating small amounts can promote normal peristalsis and thus help resolve an ileus.  (Tr. IV: 84-85).  He further testified that at one time it was believed that patients with an ileus should not take anything by mouth, but that it has been shown that giving patients a small amount of food to tolerance helps to resolve the ileus.  (Tr. IV: 84-85, 88-92).  He testified that "[t]he best medical advice we have is that the balance of risks and benefits in people with postoperative ileus favor early feeding."  (Tr. IV: 91).

---

[11] Dr. Warner testified that solid food, as opposed to liquid, was particularly problematic.  (Tr. III: 119-20).  As noted, Mr. Giguere was not given, and did not eat, any solid food while at the West Roxbury VA hospital.

176. Mr. Giguere ingested only small amounts of liquids, and no solids, during the post-operative period.

177. The Court credits the testimony of Dr. Richter that, under the circumstances, the physicians did not breach the standard of care by permitting Mr. Giguere's diet to be advanced as tolerated.

### d. Administration of Pain Medications

178. Both experts agreed that the administration of opiates may cause constipation and may worsen an ileus. (Tr. III: 106-08; Tr. IV: 18). Both also agreed, in substance, that administration of opiates to a patient suffering from an ileus requires a balance of factors, because the patient's pain must also be managed appropriately. (Tr. III: 107; Tr. IV: 35-36).

179. As noted, Percocet, which contains the narcotic painkiller oxycodone, was administered to Mr. Giguere; he received his last dose on the morning of May 9.

180. Dr. Warner testified that Mr. Giguere should not have been administered further opiates once the possibility of an ileus became a concern. (Tr. III: 106-07). Specifically, Dr. Warner testified that the use of opiates should have been discontinued on May 7. (Tr. III: 109). He suggested that the painkillers Tramadol or Ultram could have been administered, neither of which would have had a negative effect on the intestinal tract. (Tr. III: 106-07).

181. Dr. Warner further testified that stopping pain medications was especially important for Mr. Giguere, given his anatomy and medical condition. (Tr. III:107).

182. Dr. Warner also testified that the pain caused by distention of the stomach might have been masked by the opiates. (Tr. III: 108).

183. On the evening of May 8, Dr. Chrysoheris ordered morphine and Percocet for pain relief. (Ex. 3 at 92; Tr. III: 116). Dr. Warner testified that such an action was not acceptable medical practice, as narcotics should have been discontinued once an ileus was suspected.

(Tr. III: 117).  As noted, no morphine was administered after the evening of May 7.

184.  Dr. Warner concluded that the continued administration of opiates for pain exacerbated Mr. Giguere's ileus and abdominal distention, thereby impairing his cardio-pulmonary functioning and degrading his condition.  (Tr. III: 110-15).

185.  Dr. Richter agreed with Dr. Warner that alternative, non-narcotic analgesics might allow intestinal motility to recover more quickly.  (Tr. IV: 35).  He also testified, however, that they were substantially less effective as painkillers, and that a caregiver would have to balance that fact in making any decision.  (Tr. IV: 35-36).  He noted that Mr. Giguere had undergone very significant surgery—involving sawing open his breastbone and operating on his heart—only a short while before, "and he's going to experience a significant amount of pain" as a result.  (*Id.*).

186.  Dr. Richter testified that the gastroenterologist's recommendation to minimize narcotics only after an ileus had developed was "what most gastroenterologists would recommend and most surgeons would agree to."  (Tr. IV: 36).

187.  Dr. Richter testified that the physicians appropriately administered narcotics for pain relief and discontinued them when the ileus failed to resolve.  (Tr. IV: 35-36).

188.  The Court cannot conclude that the balance drawn by the physicians between providing pain relief and promoting motility was against accepted medical practice and violated the standard of care.

189.  The Court credits the testimony of Dr. Richter that, under the circumstances, the physicians did not breach the standard of care by not discontinuing narcotic painkillers until May 9.

## Conclusions of Law

1.  At all relevant times, Dr. Michael Crittenden, Dr. Elihu Schimmel, and Dr. Pericles Chrysoheris were employed by the West Roxbury VA hospital.

2.  At all relevant times, the West Roxbury VA hospital was a health care facility owned and

operated by the United States Department of Veteran Affairs.

3.    The United States is the appropriate defendant in this action.

4.    Under the Federal Torts Claims Act, the United States may be liable "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see also Bolduc v. United States*, 402 F.3d 50, 55 (1st Cir. 2005).

5.    Because the term "place" under § 1346(b) refers to the state in which the allegedly tortious acts or omissions occurred, the substantive tort law to be applied in this case is that of Massachusetts. *Id.* at 56.

6.    In Massachusetts, a surviving child may recover damages for the wrongful death of her father. Mass. Gen. Laws ch. 229 § 1(2).

7.    To prevail on a claim of medical malpractice under Massachusetts law, a plaintiff must prove by a preponderance of the evidence that (1) a physician-patient relationship existed between the physician and the injured party, (2) the physician breached his or her duty of care, and (3) the breach was the proximate cause of the injury. *Doherty v. Hellman*, 406 Mass. 330, 333 (1989).

8.    The relevant standard of care is "whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession . . . [A] specialist should be held to the standard of care and skill of the average member of the profession practicing the specialty, taking into account the advances in the profession." *Brune v. Belinkoff*, 354 Mass. 102, 109 (1968).

9.    The standard of care, however, "does not require physicians to provide the best care possible." *Palandjian v. Foster*, 446 Mass. 100, 105 (2006). The skill level required is "not the middle but the minimum common skill." W.C. PROSSER & W.P. KEETON, TORTS § 32 at 187 (5th ed. 1984), quoted *id.* at 105.

10.   Dr. Crittenden is a cardiothoracic surgeon; Dr. Schimmel is a gastroenterologist; and Dr.

Chrysoheris was a general surgical resident. The relevant standards of care for those individuals, therefore, are those of physicians who specialize in cardiothoracic surgery, gastroenterology, and general surgery, respectively.

11. A physician-patient relationship existed between Leonard Giguere and Dr. Michael Crittenden, Dr. Elihu Schimmel, and Dr. Pericles Chrysoheris.

12. According to the preponderance of the evidence, Dr. Crittenden, Dr. Schimmel, and Dr. Chrysoheris exercised the care and skill of the average qualified specialists, taking into account the advances in the profession, and did not breach their duty of care to Leonard Giguere.

13. The claims of the plaintiff are essentially claims of medical malpractice against Dr. Crittenden, Dr. Schimmel, and Dr. Chrysoheris. These claims cannot succeed in the absence of a finding of a breach of the duty of care.

14. Judgment in favor of defendant the United States of America is therefore appropriate.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  December 15, 2011          United States District Judge